# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>BEVERLY GALLAGHER<br><br>*Defendant* | )<br>)<br>)  Case No. 09-6354-SNOW<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of __11/07-6/09__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant violated __18__ U. S. C. § __§1343,1951__, an offense described as follows:

Wire Fraud by Depriving Citizens of Honest Services, Extortion Under Color of Official Right, and Bribery in Programs Receiving Federal Funds.

This criminal complaint is based on these facts:
See Affidavit Attached

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI S/A Kevin P. Griffin
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/22/09

_____
*Judge's signature*

City and state: Fort Lauderdale, Florida

U.S. Magistrate Judge Lurana S. Snow
*Printed name and title*

I, Kevin P. Griffin, being duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the Miami, Florida Field Division. I have been a Special Agent with the FBI for approximately eleven years and have been assigned to the Miami Division for all eleven years, during which time I have specialized in investigations involving drug trafficking, money laundering, and public corruption. I have personally been involved in investigations concerning public corruption.

2. This affidavit is provided for the limited purpose of establishing probable cause to support this criminal complaint. I have not included all details of all aspects of this investigation, but rather have set forth only those facts that I believe are necessary to establish probable cause. The information in this affidavit is based upon my personal knowledge as well as information I have obtained from other law enforcement agents and officers, including agents acting in an undercover capacity, confidential sources of information, consensually recorded conversations, and from a review of documentary materials.

## VIOLATIONS OF LAW

3. The facts and circumstances set forth below in this affidavit demonstrate that there is probable cause to believe that, from in or about November 2007 and continuing through the date of this complaint, Broward County School Board Member **BEVERLY GALLAGHER** (hereinafter referred to as "**GALLAGHER**") has committed the following offenses:

    a. Extortion under color of official right, in violation of Title 18, United States Code, Section 1951;

    b. Wire fraud, in violation of Title 18, United States Code, Sections 1343, and

1

1346; and

       c. Bribery involving a program receiving federal funds, in violation of Title 18, United States Code, Section 666.

## THE BROWARD COUNTY SCHOOL BOARD

4. The School Board of Broward County, Florida (hereinafter referred to as the "BCSB") is an agency of the State of Florida that oversees the operations of the Broward County Public Schools. The BCSB is a corporation under Sec. 1001.40, Fla. Stat., which consists of nine (9) elected members, seven (7) of whom represent individual districts and two (2) of whom are "at large" members. School Board Members are elected to staggered four-year terms. Each member has a vote on items brought before the School Board during School Board meetings and each may be appointed to various committees and has the authority to appoint individuals to various committees.

5. **GALLAGHER** is currently an elected Board Member of the BCSB. **GALLAGHER** was elected in 2000 and was subsequently reelected in 2004 and 2008.

6. From May 1, 2008 through April 22, 2009, the BCSB, on behalf of the Broward County Public Schools, received benefits in excess of $10,000 under a federal program involving grants, subsidies, loans, guarantees, insurance, and/or other federal assistance.

## THE BIDDING PROCESS

7. The BCSB has delegated the process of pre-qualifying vendors and contractors and awarding construction contracts, including the building and repairing of schools, to a committee called the "Qualification Selection Evaluation Committee" (hereinafter referred to as the "QSEC"). The QSEC is made up of eleven (11) voting members. These voting members are:

two (2) elected Board Members and one of their appointees; the Deputy Superintendent for Facilites; the Chief Operations Officer (COO); the Minority/ Women's Business Enterprise (M/WBE) Coordinator; the Safety Coordinator; a Senior Project Manager or an assigned Project Manager; either the Area Superintendent or a school principal; a representative of one of three (3) different builders associations; and a member of the BCSB "Facilities Task Force." A BCSB member or a staff member may have a "designee" vote in his or her place. After the QSEC votes to pre-qualify a contractor or to award a contract, the BCSB must still approve the action based on a motion by a Board Member and confirmed by a BCSB vote before the action becomes final.

## PROHIBITED ACTS UNDER FLORIDA LAW

8. The BCSB sets forth, in Policy Statement 1005, its responsibilities and authority. One of its responsibilities is that BCSB members are governed by the Code of Ethics for Public Officers and Employees pursuant to Florida Statutes, Title X, Chapter 12, Part 3 (hereinafter referred to as the "Code of Ethics for Public Officers").

9. The Code of Ethics for Public Officers prohibits elected officials from engaging in any of the following acts: 1) accepting anything of value that is based on an understanding that their vote, official action, or judgment would be influenced by such gift; 2) accepting any compensation, or thing of value when they know, or with the exercise of reasonable care should know, that it is given to influence a vote or other official action; 3) corruptly using or attempting to use their official positions to obtain a special privilege for themselves or others; or 4) disclosing or using information not available to the public and obtained by reason of their public positions for the personal benefit of themselves or others.

10. It is a violation of Sec. 838.015, Fla. Stat., for any public official to corruptly

accept or agree to accept for himself or herself or another, any pecuniary or other benefit not authorized by law with an intent or purpose to influence the performance of any act or omission which the person believes to be, or the public official represents as being, within the official discretion of a public official, in violation of a public duty, or in performance of a public duty.

11.  It is a violation of Sec. 838.016(1), Fla. Stat., for any public official to corruptly accept, or agree to accept, any pecuniary or other benefit not authorized by law, for the past, present, or future performance, nonperformance, or violation of any act or omission which the person believes to have been, or the public official represents as having been, either within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty.

12.  It is a violation of Sec. 838.016(2), Fla. Stat., for any public official to corruptly accept, or agree to accept, any pecuniary or other benefit not authorized by law, for the past, present, or future exertion of any influence upon or with any other public servant regarding any act or omission which the person believes to have been, or which is represented to him or her as having been, either within the official discretion of the other public servant, in violation of a public duty, or in performance of a public duty.

## UNDERCOVER INVESTIGATION

13. In or about April, 2005, an undercover operation (hereinafter "UCO") was initiated by the Miami Division of the Federal Bureau of Investigation to target alleged corruption involving certain public officials in South Florida. During the course of the UCO, the FBI utilized two (2) FBI agents acting in an undercover capacity (hereinafter referred to as "UC-1"

and "UC-2.") UC-1 and UC-2 posed in an undercover capacity as asset managers who, among other services, purportedly represented contractors seeking to obtain construction contracts with local governments entities.

14. On or about November 9, 2007, UC-2, **GALLAGHER**, and others met at a social function in Fort Lauderdale. During this meeting, **GALLAGHER** advised UC-2 that she would assist in directing business to UC-2's companies. **GALLAGHER** advised that they could "make a lot of money together."

### GLASS COMPANY CLIENT PREQUALIFICATION

15. On or about January 10, 2008, there was a meeting between UC-2, **GALLAGHER**, and others in Fort Lauderdale. **GALLAGHER** agreed to meet with UC-2 prior to the submission to the QSEC of the pre-qualification package for a glass company (hereinafter referred to as the "Glass Company client"), that was one of the companies UC-2 purported to represent. UC-2 has been to the warehouse of the Glass Company client and is aware that the Glass Company client purchases materials that were imported from outside the United States.

16. On or about January 28, 2008, UC-1 and UC-2 met with **GALLAGHER** in Davie, Florida. The UCs stated that they were still having trouble obtaining pre-qualification for the Glass Company client. UC-2 asked GALLAGHER if his company could hire her as a "consultant" to assist them in receiving contracts for BCSB work.

17. On or about February 7, 2008, there was a meeting among UC-1, UC-2, and **GALLAGHER** in Plantation, Florida. During a conversation with UC-2, **GALLAGHER** agreed to become a consultant to the UCs to assist them in getting School Board work for their clients. **GALLAGHER** agreed that she could work behind the scenes to direct work to the UCs'

clients.

18. On or about February 11, 2008, **GALLAGHER** sent an email to UC-1's account at Yahoo and told UC-1 to call a high ranking School board Official (hereinafter referred to as the "School Board Official") and make an appointment. The email went on to state, "He'll help you with prequal. He's expecting your call. Bev."

19. On or about February 12, 2008, UC-1 sent an email, from his Yahoo account, to **GALLAGHER** thanking her for setting up the meeting with the School Board Official and advising her that he was going to meet with him on Wednesday, February 20, 2009, at 9 a.m. **GALLAGHER** responded, "You're welcome."

## FIRST PAYMENT

20. On or about February 15, 2008, there was a meeting between UC-2 and **GALLAGHER** in Plantation, Florida. UC-2 advised **GALLAGHER** that he appreciated her help in arranging for a meeting with the School Board Official in order to get the Glass Company client pre-qualified. UC-2 stated that he had billed the Glass Company client a consulting fee of $4,000. UC-2 told **GALLAGHER** that he would split the $4,000 with her. UC-2 asked whether GALLAGHER felt that was fair. **GALLAGHER** responded that it was "more than fair." Later during that meeting, UC-2 told **GALLAGHER** that he put half of the $4,000 in a day planner, and he then provided **GALLAGHER** with the day planner containing $2,000 in cash. As he was handing **GALLAGHER** the day planner containing the cash, UC-2 told **GALLAGHER** that he liked to do "it" (pay her "fee") on a "cash basis." UC-2 then asked if "that's fine with you." **GALLAGHER** did not verbally respond but put the day planner containing the cash in a plastic bag in which she had placed leftovers from her meal. Following the meeting,

GALLAGHER departed the restaurant with the plastic bag.

## CONSTRUCTION COMPANY CLIENT

21. On or about March 26, 2008, there was a meeting between UC-2 and GALLAGHER in Fort Lauderdale. UC-2 advised GALLAGHER that he had taken on a new client (hereinafter referred to as the "Construction Company client") that wanted to do business with the Broward County School Board and wanted to meet important people in Broward County. UC-2 told GALLAGHER that he was having a party so his new client could gain access to those with influence in awarding construction contracts in Broward County. UC-2 stated that he was going to charge his new client $3,000 in lobbying fees for arranging the party and for the meeting that GALLAGHER had helped arrange with the Deputy Superintendent for Facilities. UC-2 said the $3,000 would be "the same way" (split evenly between GALLAGHER and him), and asked if that would be better than a $500 campaign contribution. GALLAGHER responded, "Yeah." UC-2 stated that his new client was willing to contribute to GALLAGHER's campaign, but UC-2 wanted to speak to GALLAGHER first. GALLAGHER responded, "My campaign, I have $90,000 which is more than enough." She told UC-2 that she would rather "make money." GALLAGHER stated that she would recruit people who vote on the QSEC to attend UC-2's party.

## SECOND PAYMENT

22. On or about April 1, 2008, there was a meeting between UC-2 and GALLAGHER in Plantation, Florida. UC-2 advised that he had billed the Construction Company client $3,000 in lobbying fees for his and GALLAGHER's work in arranging the party with voting members of the QSEC and other Broward County public officials. UC-2 asked GALLAGHER if she had

brought the day planner. Laughing, **GALLAGHER** replied, "No. I brought an envelope, though I thought you might want to see." **GALLAGHER** passed a large BCSB manila envelope across the table to UC-2. UC-2 placed $1,500 in cash in the envelope and returned it to **GALLAGHER**. **GALLAGHER** departed the meeting with the manila envelope containing the $1,500 in cash.

## CONSTRUCTION COMPANY CLIENT-SUBCONTRACTING WORK

23. On or about September 22, 2008, UC-2 met with **GALLAGHER** in Plantation, Florida. During this meeting, UC-2 advised that the Construction Company client was interested in receiving subcontracting work from the general contractors that had the major construction projects with the BCSB. UC-2 advised that the Construction Company client was going to be leaving his company soon and joining another company. **GALLAGHER** stated that she was going to contact a high ranking person at a large construction company (hereinafter referred to as "Large Construction Company 1") that does work with the BCSB in order to solicit work for the Construction Company client.

24. On or about October 2, 2008, UC-2 met with **GALLAGHER** and the Construction Company client in Fort Lauderdale, Florida. **GALLAGHER** advised the Construction Company client that she was setting up a meeting with the President of Large Construction Company 1 for the purpose of obtaining subcontracting work. **GALLAGHER** and the Construction Company client agreed that this was the fastest way to obtain construction work from the Broward County School Board.

25. On or about October 7, 2008, **GALLAGHER** and UC-2 exchanged text messages prior to and during a Broward School Board meeting. **GALLAGHER** asked UC-2, via text, to

8

spell the Construction Company client's last name. **GALLAGHER** then texted, "Sent the info. Keep your fingers crossed." UC-2 then provided **GALLAGHER** with the Construction Company client's telephone number. **GALLAGHER** responded, "That's the number I gave him." UC-2 wrote back, "Alright-Great job!" **GALLAGHER** responded, "Good team." **GALLAGHER**'s cell phone records indicate that she sent the information to a cellular telephone utilized by the President of Large Construction Company 1.

26. On or about October 15, 2008, UC-2 met with **GALLAGHER** and another person in Plantation, Florida. **GALLAGHER** advised that she would try to arrange a meeting with the President of Large Construction Company 1 and the Construction Company client for the following week.

27. On or about October 28, 2008, UC-2 and **GALLAGHER** exchanged text messages. UC-2 sent a text inquiring as to meetings that **GALLAGHER** was trying to arrange with the representatives of several general contractors that had construction contracts with the BCSB to include a high ranking employee of Large Construction Company 1. **GALLAGHER** responded that she was not only working on a meeting between the Construction Company client and the high ranking employee of Large Construction Company 1, but also a meeting with a high ranking employee and the owner of a second large construction company (hereinafter referred to as "Large Construction Company 2").

28. On or about November 12, 2008, UC-2 met with **GALLAGHER** and the Construction Company client in Plantation, Florida. **GALLAGHER** arrived first and informed UC-2 that the Assistant Vice President (hereinafter referred to as the "Assistant Vice President") of a third large construction company (hereinafter referred to as "Large Construction Company

9

3") was going to join them. **GALLAGHER** also advised that she told the Assistant Vice President that she wanted to buy him a "thank you" drink for helping with her campaign. **GALLAGHER** stated that the Construction Company client could also talk with the Assistant Vice President about getting sub-contracting work from Large Construction Company 3.

29. On or about December 10, 2008, UC-2 held a party, prior to which UC-2 asked **GALLAGHER** to invite influential persons who could assist the Construction Company client. The following persons were invited by **GALLAGHER** and attended the party: a BCSB member, two QSEC committee members, a Commissioner from a municipality in Broward County, the Assistant Vice President for Large Construction Company 3, and a high ranking member of Large Construction Company 1 (who had left Large Construction Company 1 and was now representing another construction company).

## THIRD PAYMENT

30. On or about December 17, 2008, UC-2 sent **GALLAGHER** a text message saying that he had sent a bill to the Construction Company client and suggested that UC-2 and **GALLAGHER** meet the following week. **GALLAGHER** responded, "Sounds good. I'm on vacation. Any day is fine." Later that day, **GALLAGHER** sent a text message to UC-2 stating that Large Construction Companies 2 and 3 "are getting short-listed for all jobs," referring to the QSEC for several large construction jobs to be awarded. UC-2 responded, "I guess they might need a little help, no?" **GALLAGHER** texted back, "Sounds like it to me." UC-2 responded, "Let's meet next Tues for lunch-bring your day planner-I sent (the Construction Company client) a bill for six." **GALLAGHER** responded, "Great. Next Tues. (The Assistant Vice President) just called."

31. On or about December 23, 2008, UC-2 met **GALLAGHER** in Plantation, Florida. UC-2 advised **GALLAGHER** that the Construction Company client recently paid him $6,000 for the help that UC-2 and **GALLAGHER** gave him in his attempt to obtain BCSB construction work. UC-2 asked **GALLAGHER** if she had brought a day planner or an envelope, to which she responded "No. We'll figure it out." UC-2 then placed an envelope on the table containing $3,000 in U.S. currency. **GALLAGHER** took the envelope and placed it on the seat next to her. UC-2 informed **GALLAGHER** that the envelope contained half of the $6,000 that the Construction Company client purportedly paid him. **GALLAGHER** thanked UC-2 for the payment. UC-2 informed **GALLAGHER** that the payment was for "hooking up" the Construction Company client for subcontracting work. UC-2 added that larger payments would ensue when Large Construction Company 3 actually received a contract from the BCSB and brought the Construction Company client in as a subcontractor. UC-2 stated that he and **GALLAGHER** would receive a percentage of the contract. UC-2 told **GALLAGHER** that he could not help the Construction Company client get work at the BCSB without **GALLAGHER**'s influence, and specifically her influence with Large Construction Company 3. UC-2 asked **GALLAGHER** if she had specifically talked to the Assistant Vice President about using the Construction Company client for subcontracting work, to which she responded that the Assistant Vice President is "on board." **GALLAGHER** stated that she had a plan to ensure that Large Construction Company 3 would be awarded a contract that for which it had been "short-listed" and was scheduled to present to the QSEC in the near future. **GALLAGHER** stated that Large Construction Company 3 would at least get the Hollywood Hills High School contract. I know that the proposed construction budget for the Hollywood Hills High School contract is estimated

11

at approximately $71 million. The Hollywood Hills High School contract would necessitate construction materials being brought in from outside the state of Florida. According to the bid package submitted by Large Construction Contractor 3 for the Hollywood Hills High School project, it would be "utilizing our estimating program Management Computer Controls, (MC2) Ice 2000," which was developed and manufactured by MC2, and is located at 5100 Poplar Avenue, Suite 3400, Memphis, Tennessee 38137. **GALLAGHER** stated that another large construction company ("Large Construction Company 4") would probably get the McArthur High School project. **GALLAGHER** stated that she had "figured out" the new QSEC, and "went in a different door this time." **GALLAGHER** explained that she helped the new Area Superintendent get his job, and that he was on the QSEC. **GALLAGHER** further explained that the Area Superintendent knew which construction companies **GALLAGHER** wanted him to vote for. **GALLAGHER** stated that although she would not be present when Large Construction Company 3 made its QSEC presentation, she had the principal of Hollywood Hills High School, the Area Superintendent, and **GALLAGHER**'s QSEC member representing her interests on the QSEC. She also stated she would talk to the Deputy Superintendent of Facilities who ran the QSEC process, as well as being a voting member. At the conclusion of the meeting, **GALLAGHER** placed the envelope containing the $3,000 in her purse and departed the location.

32. On or about February 4, 2009, a QSEC was held during which Large Construction Company 3 was awarded the Hollywood Hills High School contract. Among the construction contractors short-listed, but not awarded the Hollywood Hills High School contract, included a national construction company whose principal address is in Dallas, Texas, a national

12

construction company whose principal address is in Boston, Massachusetts, and a national construction company whose principal address is in Des Moines, Iowa. The QSEC members who voted Large Construction Company 3 as the number one bidder for the project included the Hollywood Hills High Principal, the Deputy Superintendent for Facilities, the designee for the Chief Operations Officer, and the M/WBE Coordinator. The McArthur High School project was awarded to Large Construction Company 4, as **GALLAGHER** had predicted approximately six weeks earlier.

33. On the evening of February 4, 2009, UC-1, UC-2, **GALLAGHER**, the Construction Company client, the Assistant Vice President, and **GALLAGHER**'s QSEC member met at Cantina Laredo to celebrate the awarding of the contract. **GALLAGHER** stated that she had just returned from Washington, D.C., that day. **GALLAGHER** said that she was nervous all day about the QSEC. **GALLAGHER** stated that, while she was still in Washington, D.C., she had contacted the Assistant Vice President telephonically, who was at the meeting, to have him to pick up the score sheets to see if "everybody came through like I wanted them to come through." **GALLAGHER** said that she spoke to the Deputy Superintendent of Facilities advising him to vote for Large Construction Company 3. **GALLAGHER** stated that she specifically told the Hollywood Hills High Principal that she wanted the project awarded to Large Construction Company 3. **GALLAGHER** advised that the Hollywood Hills Principal was under the impression that **GALLAGHER** assisted him in getting the job as Principal. **GALLAGHER** stated that, while this was not true, she took credit for it anyway. UC-2 later told **GALLAGHER** that they were going to make a lot of money. **GALLAGHER** mouthed, "I know." The Assistant Vice President toasted the group and the awarding of the contract as "a

13

team effort."

34. From on or about January 31, 2009 through on or about February 4, 2009, **GALLAGHER** was in Washington, D.C., on official business with the BCSB. On February 4, 2009, the QSEC meeting in which the Hollywood Hills project was awarded commenced at approximately 9:00 a.m. and ended at approximately 5:15 p.m. The AT&T Wireless cellular telephone records of telephone number (954) 801-2562, which was utilized by **GALLAGHER** reflect that, during the aforesaid QSEC meeting, she was in the Washington, D.C./Baltimore area, and she sent and received numerous wire communications. At 8:10 a.m., the Assistant Vice President sent a text message to **GALLAGHER**'s telephone, 954-801-2562, in Washington, D.C. At 8:45 a..m. and 9:50 a.m., **GALLAGHER** sent text messages to the Assistant Vice President. At 10:44 a.m., Gallagher sent a text message to the Assistant Vice President, and **GALLAGHER** sent a text message to the Assistant Vice President at 1:17 p.m. **GALLAGHER** then began her flight back to Florida, but continued to send text messages to the Assistant Vice President at 1:40 p.m., 1:53 p.m., and 2:04 p.m., and the Assistant Vice President sent text messages to **GALLAGHER** at 2:52 p.m. and 3:02 p.m.

## FOURTH PAYMENT

35. On or about June 3, 2009, UC-2 met with **GALLAGHER** in Plantation, Florida. UC-2 provided **GALLAGHER** with an envelope containing $6,000 in United States Currency for using her influence in order to Large Construction Company 3 the Hollywood Hills High School project and thereby get the Construction Company client subcontracting work.

_____
Special Agent Kevin P. Griffin
Federal Bureau of Investigation


Sworn and subscribed to before me
this _____ day of September, 2009

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

15